STEVEN R. KARTAGENER

ATTORNEY AT LAW

THE WOOLWORTH BUILDING
233 BROADWAY - SUITE 2340
NEW YORK, NEW YORK 10279

———

TELEPHONE (212) 732-9600
FAX (212) 732-6966
EMAIL SRK@KARTLAW.COM

December 27, 2016

Hon. Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

> RE:   **United States v. Steven McClatchey**
> **16 CR 369 (KPF)**

Dear Judge Failla:

I represent defendant Steven McClatchey (hereinafter "defendant") in the above-entitled criminal action. Defendant, 58 years old and a first-time offender, stands before this Court having been convicted by guilty plea of one count of conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. §1349, and one count of securities fraud in violation of 18 U.S.C. § 1348. At the time these offenses were committed in 2014 and 2015, defendant was a high-ranking Director of Barclay's Bank in New York City, legitimately earning in excess of $270,000 annually, plus $15,000 bonus. Prior to that, defendant worked for Lehman Brothers, before that bank went under in the financial collapse of 2008. See Presentence Investigation Report (hereinafter "PSI"), Paras. 138-139.

In addition to being heavily involved in the financial industry, defendant is an avid recreational sailor who docked his boat at a marina in Freeport, New York. There, he met a Long Island plumber named Gary Pusey, with whom defendant became friendly in 2011 or 2012. By 2013, defendant would spend most Saturdays with Pusey at the marina or on their boats. In the winter, defendant spent Saturdays with Pusey in defendant's garage, playing pool and watching sports. PSI para. 9.

In defendant's professional capacity, he routinely came into possession of valuable, non-public information relating to securities that were in play. Starting in 2014, defendant and Pusey (who later became the Government's sole cooperator) embarked on the instant scheme to capitalize on defendant's ability to gain access to such material, non-public information. As the PSI states:

Hon. Katherine Polk Failla
December 27, 2016
Page 2

" . . . . In the instant offense, the defendant befriended an individual (Gary Pusey) at a local marina, where they both docked their boats. Through McClatchey's employment at Barclays, he obtained nonpublic information pertaining to mergers and acquisitions. He then provided this inside information to Pusey, who executed profitable trades in the securities of at least 10 companies. Pusey reaped approximately $76,000 in ill-gotten gains from the trades off the inside information. Pusey provided McClatchey with cash payments between $300 and $500 after his trades (about 10 times), and McClatchey received about $1200 to $1500 in free tiling work. McClatchey's advisory guidelines range is 10 to 16 months." See PSI pp. 26-27.

Thus, astonishingly, it appears that defendant was willing to jeopardize his lucrative career and his good name for somewhere between $3000 and $5000 in cash – total – and about $1200 to $1500 worth of tile work – the cost of a minor home repair. The bizarre nature of this situation has not been lost on defendant's wife, Angela. Mrs. McClatchey made the following comments to the probation officer:

"She was uncertain why he became involved in the instant offense. She said that it is 'not Steve's character or way of thinking at all'. Mrs. McClatchey said that in her heart, she can't fathom her husband doing something that would jeopardize his career that he worked so hard to achieve. She said that he had too much to lose and still can't believe that he would risk it all. She commented that the whole situation has been 'so weird.'" PSI para. 124.

The PSI in this case was prepared by USPO Ross N. Kapitansky, and approved by SUSPO Kathleen Coad. They agree that defendant's conduct here makes no sense:

"McClatchey's decision to commit to the instant offense is baffling. He appeared to risk so much in committing the offense, with such little to gain." See PSI p. 27.

Mr. Kapitansky and Ms. Coad recommend to the Court a sentence of non-imprisonment:

"After considering the nature and circumstances of the offense and the history and characteristics of the defendant, we do not believe an imprisonment term is necessary to satisfy the sentencing objectives set forth in 18 U.S.C. § 3553(a)(2). As such, *we recommend a slight variance to time served, followed by two years supervised release, to include five months' home confinement. The defendant is capable of paying a fine and we recommend a fine at the high-end of the guidelines range.*"

Emphasis added.

Hon. Katherine Polk Failla
December 27, 2016
Page 3

For the reasons that follow, we respectfully urge this Court to adopt the recommendations of the Probation Department.

## Defendant's Letters of Support

Submitted along with this letter are 30 additional letters, coming from defendant's family, friends, and co-workers, which seek leniency on defendant's behalf. Many of these letters were written by people who have known defendant for decades, and who have opted to stand by him notwithstanding his recent fall from grace. Their letters uniformly describe defendant as being a devoted husband, father, and family man, someone who routinely looks out for the well-being of his extended family, friends, and co-workers. Defendant has shown on numerous occasions that he is fundamentally an honest, honorable man who is extremely remorseful for having engaged in his patently aberrant conduct in this case. See, e.g., Letters of Richard J. Andre, Richard Edelman, Ralph A. Ponte, Andrew Capone, Camine J. Pagano, and Joseph Scamuffo.

Defendant's wife Angela has only praise for the man she married:

"Steve is a considerate man who likes to write nice cards, and doesn't care when I don't feel like making dinner. He's a humble guy who doesn't brag, nor is he showy. He's low key and has old-school values (something that today has been thrown to the wayside). He's a gentleman and respectful to all women and especially to the elderly. Steve was very helpful to me when I was caring for my 93-year-old bachelor Uncle Dom. We would travel from Freeport, L.I. to Richmond Hill, Queens and Steve would cart him to doctor appointments and a friend's house while I would do the shopping, cooking and cleaning. Steve never grumbled because he was very close with his grandparents and understood the importance of showing respect and patience."

Defendant and his wife have a single son, Michael, a recent college graduate who, like his father, is going into the financial industry. Mrs. McClatchey writes:

"Our son Michael is incredibly close with his father. When they are together all you hear is a lot of laughter and an easy vibe between them. During the difficult teen years, most kids tend to be embarrassed by one or both of their parents. Not so with Michael; he couldn't have been more proud of his dad."

In her letter, Mrs. McClatchey makes mention of the fact that:

"Steve worked at the World Financial Center and on 9/11 witnessed the explosions, carnage and people jumping from windows. A sight one does not easily forget. His advice to a lot of our friends and family, many times, was to appreciate all that you

Hon. Katherine Polk Failla
December 28, 2016
Page 4

have and realize what is important in your life. Tomorrow is not promised."

The letter of co-worker Joseph Scamuffo, who was "flabbergasted" to learn of defendant's arrest, reveals that defendant was far more than just a witness to the tragic, deadly events of 9/11. On that day, defendant showed himself to be truly courageous in the face of those shocking events. Mr. Scamuffo writes:

> "I will always have my most vivid memory of Steve when it relates to 9/11 and its aftermath. We were together looking out the window from the World Financial Center after the first plane hit Tower One, when the fireball of plane Two exploded before our eyes. Against our better judgment and per building orders, we were told to remain in place after plane one hit. Upon the second plane hitting, Steve as calmly as could be expected under the circumstances went office to office and cube to cube, letting colleagues know that it was time to evacuate, despite the poor instructions that told all to stay in place. Our building was nearly destroyed, and for the next six months Steve myself and a third colleague shared a hotel room at the Sheraton Manhattan hotel in times square, together with the rest of the Lehman Brothers investment banking group at the Sheraton."

Defendant never made any claim to being a hero for what he did to protect his co-workers on that sad day. His co-workers know better.

Defendant's accompanying letters of support are filled with many anecdotal instances which show so much of the good that he has done for others, sacrificing his own time, money and effort. Rarely does he seek anything in return. Defendant has, time and again, demonstrated that he is primarily a giver rather than a taker, a protector of others. We respectfully urge this Court to accept the notion, as has the Probation Department, that the many good deeds that defendant has done over the preceding 30 to 40 years have given defendant some basis to hope that this lone, foolhardy insider trading scheme he carried out with his fishing buddy, Gary Pusey, need not necessarily result in a period of imprisonment. In this instance, we hope that justice will be tempered with mercy.

For all of these reasons, we ask the Court to impose the sentence recommended by the Probation Department. Thank you.

Respectfully submitted

Steven R. Kartagener