UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,          :

      -v.-                               :          S1 16 Cr. 369 (KPF)

STEVEN MCCLATCHEY,                 :

         Defendant.             :
------------------------------------------------------x

# GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Rebecca Mermelstein
Assistant United States Attorney
- Of Counsel -

PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Steven McClatchey ("McClatchey" or the "defendant"), which is scheduled for January 11, 2017 at 2:00 p.m., and in response to the defendant's sentencing letter dated December 28, 2016 ("Def. Ltr."). The defendant seeks a non-incarceratory sentence, arguing both that his criminal conduct was aberrant behavior and that he profited only minimally. Such a sentence, however, would be insufficient in light of the defendant's longstanding involvement in the offense and his exploitation of the trust placed in him by his employer. For the reasons set forth below, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 10 to 16 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

BACKGROUND

I.   The Offense Conduct

Between December 2008 and December 2015, the defendant was employed at an investment bank in Manhattan (the "Investment Bank"). (PSR ¶ 8; 138). At the time of the instant offense, the defendant was a Director in mergers and acquisitions, making just under $300,000 a year. (PSR ¶ 138). Among his responsibilities, the defendant was tasked with tracking all potential mergers and acquisitions in which the Investment Bank was involved. (PSR ¶ 138). This role gave the defendant unique access to information about a broad swath of deals in which the Investment Bank was involved at any given time. For example, the defendant was notified when the Investment Bank ran a conflict check for a new client, when an engagement letter was signed, and when internal Investment Bank committees met concerning

new deals. (PSR ¶ 8).  The defendant also communicated directly – both by phone and email – with bankers assigned to particular mergers or acquisitions about the stage of a deal, the fees for such a deal, and the likely timing of any announcement.  (PSR ¶ 138).  Such information was highly sensitive and confidential.  Accordingly, throughout his employment at the Investment Bank, McClatchey received training concerning confidential information – including material nonpublic information, the protections to be afforded to such information, and the prohibition on the use of such information to trade in securities or to advise anyone else to trade in securities.  (Complaint ¶ 15).

Notwithstanding the defendant's clear understanding of the highly sensitive nature of the information to which he had access, the trust placed in him by the Investment Bank and its clients, and his training, over the course of more than a year, the defendant tipped his friend, Gary Pusey, about more than ten separate M&A transactions in which the Investment Bank was involved.[1]  (PSR ¶ 32).   In each case, in the course of his employment at the Investment Bank, the defendant received material nonpublic information about a pending transaction.  (PSR ¶ 31).  The defendant provided that information to Pusey, typically while spending the day on one of their boats, or otherwise socializing.  McClatchey did so knowing full well that Pusey would use the information to make profitable trades.  Indeed, Pusey shared the profits of these illegal trades by giving McClatchey cash payments following each profitable trade.  (Complaint ¶ 17).  Pusey also provided McClatchey with free assistance with a renovation in McClatchey's home.  (PSR ¶ 33).  In total, Pusey made approximately $75,000 from his illegal insider trading, and provided McClatchey with several thousand dollars in illegal proceeds.  (PSR ¶¶ 32-33).

---

[1] In addition to the ten transactions outlined in the Complaint, the defendant tipped Pusey about at least three other pending, non-public transactions.  Although Pusey purchased shares of, respectively, Staples, Lorillard, and Apollo Education Group based on these tips, Pusey did not ultimately profit from these purchases.

II.     The Plea Agreement

On July 12, 2016, the defendant pleaded guilty pursuant to a plea agreement (the "Plea Agreement"). As set forth in the Plea Agreement, the defendant and the Government agreed that the defendant's offense level is 12, calculated as follows: a base offense level of eight increased by six levels because the gain reasonably foreseeable to the defendant was more than $40,000, but less than $95,000; and a three-level reduction for acceptance of responsibility. (PSR ¶ 5). Based on an offense level of 12 and a Criminal History Category of I, the parties agreed that the applicable Guidelines range was 10 to 16 months' imprisonment. (PSR ¶ 5).

## ARGUMENT

I.     A Guidelines Sentence is Consistent with the Goals of Sentencing, the Characteristics of this Defendant, and the Nature of This Offense

Both the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and the "history and characteristics of the defendant," *id.*, weigh in favor of an incarceratory sentence. An incarceratory sentence is also needed "to reflect the seriousness of the offense," "promote respect of the law," "provide just punishment," and adequately deter similar conduct. 18 U.S.C. § 3553(a)(2).

The defendant repeatedly, over the course of more than a year, betrayed the significant trust placed in him by the Investment Bank to benefit both his friend and himself. Information about pending mergers and acquisitions is so sensitive and confidential that even within the Investment Bank, it was shared on a need-to-know basis. The defendant, by virtue of his position, was part of a very small group at the Investment Bank of individuals trusted with access to the full scope of the Investment Bank's mergers and acquisitions activities. As evidenced even in letters submitted on the defendant's behalf at sentencing, he was well aware of the significance of this trust and of the importance of maintaining the confidences of the Investment

4

Bank and its clients. *See, e.g.*, Def. Ltr. Ex. 1 (the defendant "reveled in the trust [he] earned professionally" and is "aware of the consequences of purposely breaking confidentiality"); Def. Ltr. Ex. 2 (the defendant was "at the forefront of all controls, aware of highly confidential data, and knew the rules of conflict of interest"); Def. Ltr. Ex. 7 (the defendant "knew about pending, unannounced (to the markets) transactions" and "knew explicitly that this information was to be kept in the strictest confidence and that [he] had a fiduciary duty to [the Investment Bank], [the Investment Bank's] clients, and to the capital markets"); Def. Ltr. Ex. 10 ("one was not afforded the opportunity to hold [the defendant's] position without the trust and respect of the most senior executives within the Investment Banking group"). Thus, the defendant's breach of this special trust sets him apart from lower level company insiders who violate general duties of confidentiality. Indeed, it was the defendant's unusual level of access to the full scope of the Investment Bank's work that permitted the defendant to tip Pusey – not once or twice – but more than a dozen separate times.

An incarceratory sentence is necessary to adequately punish this gross breach of trust and to deter other similarly situated insiders from engaging in similar behavior. It is essential that those entrusted with valuable, confidential information about pending transactions safeguard that information from disclosure and misuse. A probationary sentence is simply inadequate to send a message of general deterrence against conduct like the defendant's. An incarceratory sentence is also appropriate in light of the repeated and longstanding nature of the defendant's criminal conduct. Indeed, the defendant's suggestion that his conduct was aberrational is refuted by the sheer number of tips. The defendant did not merely tip Pusey on one or two occasions. To the contrary, the defendant tipped Pusey time and time again, each time accepting cash payments tucked into his gym bag or palmed to him during a goodbye handshake. The defendant did not

5

make a one-time mistake.  Although he could have stopped at any point, every time he tipped Pusey the defendant decided anew to engage in criminal conduct.[2]

Finally, the fact that the defendant personally profited only modestly does not justify a non-incarceratory sentence.  The defendant's serious and repeated breach of his employer's and his clients' trust remains, notwithstanding the small amount of money he earned through his criminal conduct. While it is true that he risked much for little personal compensation, the harms caused by his conduct simply cannot be measured solely by his own profits as Pusey's activities were entirely foreseeable to him.

## CONCLUSION

For the reasons set forth above, given the nature and circumstances of the offense, a Guidelines sentence is sufficient but not greater than necessary to meet the ends of sentencing.

        Respectfully Submitted,
        PREET BHARARA
        United States Attorney

By:   /s Rebecca Mermelstein
        Rebecca Mermelstein
        Assistant United States Attorney
        (212) 637-2360

Cc:    Steven Kartagener, Esq.

---

[2] The repeated suggestion in various of the letters submitted in support of the defendant that Pusey was somehow to blame for McClatchey's decision to engage in criminal conduct is also without merit.  *See*, *e.g.*, Def. Ltr. Ex. 7 (the letter writer can "only surmise that some confidence was broken by [Pusey] and that he somehow betrayed [the defendant's] trust in him."); Def. Ltr. Ex. 3 ("maybe this new friend [Pusey] was a master manipulator"); Def. Ltr. Ex. 1 ("[s]omething went haywire with this new-found friendship [between the defendant and Pusey).  Pusey did not pressure McClatchey or even request the inside information.  Indeed, it was McClatchey who first initiated discussions of the inside information and who raised the issue each time he tipped Pusey about a new deal.